**UNITED STATES of America,**
**Plaintiff-Appellant,**
v.
**Feodor FEDORENKO, etc.,**
**Defendant-Appellee.**

No. 78–2879.

United States Court of Appeals,
Fifth Circuit.

June 28, 1979.

Rehearing and Rehearing En Banc
Denied Aug. 15, 1979.

J. V. Eskenazi, U. S. Atty., Miami, Fla., Allan A. Ryan, Jr., Asst. Sol. Gen., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Phil Baum, Assoc. Exec. Dir., American Jewish Congress, New York City, for Amer. Jewish Congress, et al.

Celentano & Gildea, Brian M. Gildea, New Haven, Conn., Gregg J. Pomeroy, Fort Lauderdale, Fla., for defendant-appellee.

Before WISDOM, CLARK, and FAY, Circuit Judges.

WISDOM, Circuit Judge:

This appeal raises an important question concerning the standard to be applied to the materiality of a misrepresentation by nondisclosure in an action for revocation of citizenship. The government brought this action to revoke the citizenship of Feodor Fedorenko, the defendant-appellee, a naturalized citizen. We agree with the government that the district court erred as a matter of law when it held that the defendant had not procured his citizenship by concealment of a material fact. We hold that it is not necessary that the government prove the existence of facts which, in and of themselves, would have justified denial of citizenship. It is necessary to prove only that the facts which the defendant admittedly misrepresented might, if disclosed, have led to the discovery of other facts which would have justified denial of citizenship. Accordingly, we reverse and remand to the district court with instructions to revoke the defendant's certificate of naturalization.

## I.

Fedorenko was born in the Ukraine in 1907. In 1941, while serving in the Russian Army, he was captured by German forces. According to his own admissions, the Germans trained him to serve as an armed concentration camp guard and sent him to Treblinka, Poland, a notorious extermination camp.

Following World War II, he worked as a laborer in Germany for four years. In 1949, he applied for admission to the United States under the Displaced Persons Act of 1948, 62 Stat. 1009. Before the district court, the defendant admitted that he had falsified his application for a visa for the United States by misstating his whereabouts during the war years and by failing to note his service as a concentration camp guard. He admitted that he deliberately stated on the visa application that he had been a farmer in Sarny, Poland from 1937 to March 1942, and that the Germans had forced him to work as a laborer from that date until the end of the war. Based on this visa application, an American vice-consul classified the defendant as a displaced person and issued him a visa.

The defendant came to America in November 1949. He has resided in this country since that time and, as the government admits, has led an uneventful and law-abiding life. In 1969 he applied for naturalization. In response to a question on the naturalization application about any foreign military service, he noted his service in the Russian army in 1941. He did not reveal, however, that he had served in the German army as a guard at Treblinka. The Immigration and Naturalization Service (INS) examiner scrutinized the defendant's visa papers, including a report by the Displaced Persons Committee that the defendant had been a farmer and factory worker from 1941–1945. The examiner took these visa papers at face value and recommended that the defendant's application be granted. The defendant was naturalized in 1970.

The government filed this action under 8 U.S.C. § 1451(a) to denaturalize the defendant on the theory that he had procured his citizenship by concealment and misstatement of material facts. The district court refused to strip the defendant of his citizenship. *United States v. Fedorenko*, 1978, S.D.Fla., 455 F.Supp. 893. The court found that the defendant had made false statements in his visa application about his whereabouts during the war years and had failed to disclose his service as a concentration camp guard. The district court held,

however, that the defendant's deception did not constitute material misrepresentation and concealment within the meaning of 8 U.S.C. § 1451(a). The court also rejected evidence that the government presented to support its allegation that the defendant had committed war crimes. Finally, the court held that, even if the defendant was guilty of making material misstatements and omissions, equitable considerations required the court to enter judgment for the defendant.

In this appeal, the government raises three challenges to the judgment of the district court. First, it asserts that the defendant's own admissions indicate that his naturalization resulted from material misrepresentation and concealment. Second, it argues that the district court erred in refusing to consider testimony by several survivors of Treblinka, who identified the defendant as a camp guard whom they had observed committing war crimes. Third, it argues that the district court erred in holding that equitable considerations may serve as an alternative ground for its judgment in favor of the defendant.

## II.

8 U.S.C. § 1451(a) provides:

It shall be the duty of the United States attorneys . . . to institute proceedings . . . for the purpose of revoking and setting aside the order admitting [a naturalized citizen] to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation . . . .

To assess the government's argument that the defendant's misrepresentation and concealment were "material" under this provision, this Court must first examine the Displaced Persons Act, 62 Stat. 1009, the statute under which the defendant obtained his visa. In that Act, Congress allowed European refugees driven from their homelands by the war to emigrate to the United

States without regard for the usual immigration quotas. Section 2(b)–(c) of the Act defined "eligible displaced person" largely by reference to the definition of "refugee or displaced person" found in Annex I of the Constitution of the International Refugee Organization of the United Nations, 62 Stat. 3037. That constitution provided that the following persons did not qualify for displaced person status:

1. War criminals, quislings and traitors.
2. Any other persons who can be shown:
   (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or
   (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.

62 Stat. 3051–52. In addition, § 13 of the Displaced Persons Act itself provided that

[n]o visas shall be issued under the provisions of this Act to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States.

62 Stat. 1014.

The government argues that, because the defendant's service as a concentration camp guard indicates that he voluntarily assisted the enemy in persecuting civil populations, he was not qualified for admission into the United States under the Displaced Persons Act. By failing in his visa application to reveal his whereabouts during the war years and his concentration camp guard service, the government continues, the defendant fraudulently obtained his visa. His entry into and residence in the United States were unlawful,[1] then, and his naturalization was invalid, since the statute under which he was naturalized required that he must have resided in the United States for at least five years "after being lawfully admitted for permanent residence".[2]

The government's argument hinges on its assertion that the defendant's statements on his visa application about his wartime whereabouts and his deliberate concealment of his service as a concentration camp guard were "material" within the meaning of 8 U.S.C. § 1451(a). The government and the defendant agree that this Court must apply to the facts of this case the standard for materiality adopted by the Supreme Court in *Chaunt v. United States*, 1960, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120. The parties disagree, however, on the meaning of the *Chaunt* standard. To resolve their conflicting assertions, we examine *Chaunt* in detail.

In *Chaunt*, the government sought to denaturalize the defendant because he had procured his citizenship by concealment and misrepresentation of his arrest record. He had stated on a form connected with his naturalization that he had never been arrested. In fact, he had been arrested three times: once for distributing handbills in violation of an ordinance, once for making a speech in violation of park regulations, and once for general breach of the peace. All of these arrests occurred at least ten years prior to the defendant's naturalization. Although the record in the case was not clear, it appeared that he was convicted of only one charge, that involving the park regulation. The district court canceled the defendant's naturalization, and the Court of Appeals for the Ninth Circuit affirmed. *Chaunt v. United States*, 1959, 270 F.2d 179.

The Supreme Court reversed. 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120. It first noted that in a denaturalization proceeding the government bears the burden of proof by "clear, unequivocal, and convincing" evidence. 364 U.S. at 353, 81 S.Ct. 147. The Court then held that a misrepresentation or concealment was material only if the government proved

---

1. *See* § 10 of the Displaced Persons Act, 62 Stat. 1013 ("[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States"). *See also*

§ 13(a) of the Immigration Act of 1924, 43 Stat. 153, 161, which was in effect when the defendant entered the United States.

2. Immigration and Nationality Act of 1952, § 316(a), 8 U.S.C. § 1427(a).

either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

364 U.S. at 355, 81 S.Ct. at 151. In applying these alternative materiality standards to the facts of the case, the Court found the government's evidence wanting. As to the first standard, the Court held that the "nature of the arrests, the crimes charged, and the disposition of the cases", in and of themselves, did not even approach clear and convincing evidence that would have warranted denial of citizenship on the ground that the defendant lacked good moral character or did not intend to abide by the laws of the land. 364 U.S. at 354, 81 S.Ct. at 150. As to the second standard, the Court rejected the government's contention that disclosure of the arrests would have caused the Immigration Service to conduct an investigation in which it might have discovered that these arrests had involved activities on behalf of the Communist Party. The Court noted that the defendant had disclosed that he was an employee and member of the International Workers' Order (IWO). Even though the government considered the IWO to be controlled by the Communist Party, the Immigration Service had failed to make any investigation of the defendant's background. Since the Service had failed to investigate whether the relatively incriminating admission of involvement in the IWO indicated that the defendant was a Communist, the Court concluded that, had the defendant revealed that he had been arrested three times for petty offenses, the Service would not have begun an investigation that might have uncovered the defendant's political affiliation and resulted in denial of citizenship. *Id.* at 354–55, 81 S.Ct. 147.

The courts of appeals have disagreed on the interpretation to be accorded *Chaunt.* The defendant argues that this Court should adopt the analysis found in *United States v. Rossi,* 9 Cir. 1962, 299 F.2d 650, and *La Madrid-Peraza v. INS,* 9 Cir. 1974, 492 F.2d 1297. In these cases, the Court of Appeals for the Ninth Circuit held that, under *Chaunt,* a fact suppressed or misstated is not material unless the truth would have justified denial of citizenship. The government responds by asserting that the better analysis is found in *United States v. Oddo,* 2 Cir. 1963, 314 F.2d 115, *cert. denied,* 375 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d 63. In that case, the Court of Appeals for the Second Circuit held that a fact suppressed or misstated that would not, in and of itself, have warranted denial of citizenship is material nonetheless if its disclosure would have led the government to conduct an inquiry that might have uncovered other facts justifying denial of citizenship. *Cf. Kassab v. INS,* 6 Cir. 1966, 364 F.2d 806, 807; *Langhammer v. Hamilton,* 1 Cir. 1961, 295 F.2d 642, 648.

The district court adopted the approach of the Court of Appeals for the Ninth Circuit. It held that the government's evidence was not clear and convincing proof that the defendant's whereabouts during the war and his service as a concentration camp guard were, in and of themselves, ultimate facts warranting refusal to issue a visa and denial of citizenship. This finding, of course, was responsive to the first materiality test adopted in *Chaunt*—whether "facts were suppressed which, if known, would have warranted denial of citizenship". The district court then held that this finding also disposed of the government's argument that the defendant's deception was material under the second test in *Chaunt*—whether "disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship". The district court held that under this standard the government must first prove the existence of ultimate facts warranting denial of citizenship and then prove that disclosure of the suppressed or misstated facts might have led to the discovery of the ultimate facts. Since the district court had concluded that the government had shown no such

ultimate facts, it granted judgment for the defendant.

■ We hold that the district court's interpretation of the second materiality test of *Chaunt* was an error of law. That interpretation destroyed the utility of the second *Chaunt* test, since it would require, as does the first *Chaunt* test, that the government prove ultimate facts warranting denial of citizenship. We read the second test to require only that the government prove by clear and convincing evidence that disclosure of the true facts would have led the government to make an inquiry that might have uncovered other facts warranting denial of citizenship.

Our interpretation comports with the language of the *Chaunt* opinion. The phraseology of the two tests adopted in *Chaunt* does create some ambiguity about the meaning to be accorded the second test. In an earlier portion of the *Chaunt* opinion, however, the Court cited two unambiguous ways in which nondisclosure would be material:

> Suppressed or concealed facts, if known, might in and of themselves justify denial of citizenship. Or disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship.

364 U.S. at 352–53, 81 S.Ct. at 149. This passage parallels the Court's later statement adopting the two materiality tests. The passage indicates that the key to the second test is whether disclosure would have led the government to make an inquiry that might have resulted in denial of citizenship. Indeed, the decision in *Chaunt* was grounded in this analysis: since the government had failed to inquire about Chaunt's political affiliation when it knew that he had been active in an organization the government believed was associated with Communist groups, there was no basis for believing that the government would have made any inquiry if he had disclosed his rather insignificant arrest record.[3]

Our interpretation of *Chaunt* is further fortified when the ramifications of a contrary holding are considered. The approach adopted by the district court would allow an applicant for a visa or for citizenship to lie about his background and thereby prevent the government from investigating his fitness at a time when he has the burden of proving eligibility.[4] If his deception is later discovered, the district court's approach would require the government to carry out three difficult tasks: to conduct an investigation into the past, discover ultimate facts warranting disqualification, and prove those facts in court by clear and convincing evidence. As the government properly contends, if that were the law, an applicant with something to hide would have everything to gain and nothing to lose by lying under oath to the INS. *See Ganduxe y Marino v. Murff*, 1959, S.D.N.Y., 183 F.Supp. 565, 567, *aff'd*, 2 Cir. 1960, 278 F.2d

**3.** In a case predating *Chaunt*, the Court of Appeals for the Sixth Circuit made a clear and concise statement of this approach:

> Upon analysis, the issue is not whether naturalization would have been denied appellant had he revealed his numerous arrests, but whether, by his false answers, the Government was denied the opportunity of investigating the moral character of appellant and the facts relating to his eligibility for citizenship. . . . Where fraud has been practiced by the alien in procuring citizenship, it is not required that the Government in a denaturalization proceeding should meet the standard necessary for conviction in a criminal case. It will suffice to show that the applicant lied concerning a material fact which, if revealed, might have prevented his acquisition of citizenship.

*Corrado v. United States*, 6 Cir. 1955, 227 F.2d 780, 784, *cert. denied*, 351 U.S. 925, 76 S.Ct. 781, 100 L.Ed. 1455. As our discussion in the text indicates, we read the second test of *Chaunt* as adopting this approach.

**4.** As we have noted, Fedorenko was admitted to the United States under the Displaced Persons Act. Section 10 of the Act provided that "[t]he burden of proof shall be upon the person who seeks to establish his eligibility under this Act". 62 Stat. 1013. The present provision placing the burden of proving eligibility upon the applicant for admission into the United States is found in 8 U.S.C. § 1361. An applicant for naturalization bears the burden of proving eligibility under 8 U.S.C. § 1429. *See also Berenyi v. INS*, 1967, 385 U.S. 630, 636–37, 87 S.Ct. 666, 17 L.Ed.2d 656.

330, *cert. denied*, 364 U.S. 824, 81 S.Ct. 61, 5 L.Ed.2d 53.[5]

As Mr. Justice Black has written, "[n]ot only is United States citizenship a 'high privilege', it is a priceless treasure". *Johnson v. Eisentrager*, 1950, 339 U.S. 763, 791, 70 S.Ct. 936, 950, 94 L.Ed. 1255 (dissenting opinion). To guard the integrity of this priceless treasure, the government must be accorded the authority to seek the denaturalization of those who, in procuring citizenship, misstated or concealed facts that, if disclosed, would have led the government to conduct an inquiry that might have resulted in denial of citizenship.[6]

### III.

Before the district court, the government presented expert testimony designed to satisfy both of the *Chaunt* tests. The expert witness, Kempton Jenkins, had served as an American vice-consul in Germany administering the Displaced Persons Act. He testified that the vice-consuls were responsible for deciding whether to issue a visa

under the Displaced Persons Act and that, for all practical purposes, their decisions were final. According to Jenkins, the vice-consuls believed that any visa applicant who had served as a concentration camp guard was ineligible as a matter of law for a visa because that service constituted either persecution of citizens (war crimes) or voluntary assistance of the enemy. He stated that the vice-consuls considered "involuntary" camp guard service to be a contradiction in terms. To his knowledge, no person who was discovered to have been a guard ever attempted to convince the vice-consuls that his service had been involuntary; instead, Jenkins testified that these persons admitted that they had chosen to undertake that service rather than go into forced labor divisions because the life of a guard was more comfortable.

■■ The district court found unpersuasive Jenkins's testimony that all concentration camp guards were automatically disqualified from obtaining a visa. The court then held that the government had failed to

---

5. The commentators agree with our assessment of *Chaunt*. Appleman has stated that "[t]he inference [to be drawn from *Chaunt*] is that had the facts been of such nature that their disclosure would have been useful in an investigation *possibly* leading to ultimate denial, the Court would regard them as material". Appleman, *Misrepresentation in Immigration Law: Materiality*, 22 Fed.B.J. 267, 272 (1962) (Emphasis in original). Similarly, Gordon and Rosenfield have asserted:

One view would regard a misstatement as material only if the true facts, if disclosed, would have required denial of the naturalization. [Citing *United States v. Rossi*, 9 Cir. 1962, 299 F.2d 650.] This position has not been generally accepted, and the Supreme Court has declared that a misstatement is material if disclosure would have justified denial of citizenship. [Citing *Chaunt*.] The court stressed the importance of exacting full, frank, honest and unequivocal answers to questions and vigorously discouraged temporizing with the truth.

Decisions in the lower courts generally have held the naturalization applicant to strict accountability for intentional deceptions, emphasizing the government's right to obtain full and truthful responses to its inquiries in the naturalization proceeding, so that it would be enabled to conduct any necessary investigation. [Citing, *inter alia, United States v. Oddo*, 2 Cir. 1963, 314 F.2d 115.]

3 C. Gordon & H. Rosenfield, *Immigration Law and Practice*, § 20.4(b) at 20–14 (1979) (footnotes omitted). *See also* 1A *id.* at § 4.7c.

6. As the text indicates, the second materiality test of *Chaunt* is satisfied in a denaturalization proceeding when the government proves by clear and convincing evidence that, if the misrepresented facts had been revealed, it *would* have conducted an investigation that might have resulted in denial of citizenship. This is the standard that the government has urged us to adopt. A less stringent alternative would require the government to prove only that disclosure *might* have led it to conduct an investigation that might have resulted in denial of citizenship. *See Kassab v. INS*, 6 Cir. 1966, 364 F.2d 806, 807. That the government chose to endorse the stronger of these standards may reflect an appreciation that, "in view of the grave consequences to the citizen, naturalization decrees are not lightly to be set aside—the evidence must indeed be 'clear, unequivocal, and convincing' and not leave 'the issue in doubt'", *Chaunt*, 364 U.S. at 353, 81 S.Ct. at 149 (quoting *Schneiderman v. United States*, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796), and "the facts and law should be construed as far as is reasonably possible in favor of the citizen", *Schneiderman*, 320 U.S. at 123, 63 S.Ct. at 1335.

prove by clear and convincing evidence that the defendant's guard service was voluntary and therefore would have resulted in denial of a visa. That finding satisfied the first *Chaunt* test but, under our holding in Part II above, not the second. The evidence before the district court clearly and convincingly proved that, had the defendant disclosed his guard service, the American authorities would have conducted an inquiry that might have resulted in denial of a visa.[7] The defendant, then, was guilty of making a misrepresentation and concealment of material facts within the meaning of *Chaunt.* The defendant's assertion before the district court that his guard service was involuntary comes thirty years too late: by failing to disclose that service on his visa application, he prevented the government from conducting a timely investigation of whether he had served under duress or had committed war crimes. In addition, it is irrelevant whether the defendant perpetrated the fraud to avoid repatriation to Russia, as he also has asserted, since the immigration law does not allow a defense that a material misrepresentation was motivated by fear of what might have resulted if the applicant had told the truth. *See* 8 U.S.C. § 1451(a).

### IV.

Survivors of Treblinka who testified at the trial identified Fedorenko as having been an armed guard at the camp and as having committed acts of violence against the prisoners. We have held, however, that the defendant obtained his citizenship by misrepresentation and concealment of his whereabouts during the war years and his service as a concentration camp guard. Accordingly, we need not address the government's argument that it had proved that he had concealed his perpetration of war crimes at Treblinka. We must, however, consider the district court's alternative holding that, even if the defendant had made material misrepresentations and nondisclosures, equitable considerations required judgment for the defendant.

The district court held that "[t]his denaturalization proceeding is a suit in equity . . . ., and equity demands the weighing of the rights of the parties in light of all the circumstances in order to arrive at a decision which is fair and just". 455 F.Supp. at 918. The court then determined that the equities required judgment for the defendant. *Id.* at 921. It acknowledged that no prior cases had held that a district court had this authority in a denaturalization case, but nonetheless held that the authority exists because "lower courts have exercised discretion in determining whether citizenship should be granted". *Id.* at 919. In so holding, the district court erred as a matter of law. There is a crucial

---

**7.** Jenkins testified:

> Q. Mr. Jenkins, if either of those documents [the Displaced Persons Commission report or the visa application] had stated that the applicant had served as a guard at any concentration or death camp in occupied Poland during the war what would you have done?
>
> .   .   .   .   .
>
> A. The answer is if there is any indication that the man had served or been involved in any of the concentration camps that [sic] we would have stopped the case right there, suspended it, and called for a further investigation by the CIC [Army Counter-Intelligence Corps] and the other resources we had available and I would of course interrogate the applicant in some depth and with some vigor at that point, and then after I had received whatever information I could dig up I would have reinterrogated at that point.

Tr. 766–67. The district court had refused to accord conclusive weight to Jenkins's testimony that disclosure of the defendant's guard service would have automatically resulted in denial of the visa in large part because the court felt that Jenkins defined "voluntariness" too narrowly and did not have a complete appreciation of the conditions existing at a concentration camp. It appears that the court found no fault with Jenkins's testimony on the processes by which the vice-consuls made their decisions regarding visa applications, and upon reviewing the record we believe that this testimony must be accorded substantial weight. Indeed, the district court found as a matter of fact that "[i]f the Treblinka term had been known, it certainly would have prompted an investigation by the Vice-Consul to determine whether defendant committed atrocities at Treblinka or served voluntarily as a guard, or was otherwise excludable from admission under . . . the Displaced Persons Act". 455 F.Supp. at 915.

distinction between a district court's authority to grant citizenship and its authority to revoke citizenship. In the former situation, the court must consider facts and circumstances relevant to determining whether an individual meets such requirements for naturalization as good moral character and an understanding of the English language, basic American history, and civics. *See* 8 U.S.C. §§ 1423, 1427. The district courts must be accorded some discretion to make these determinations. *See, e. g., Petition of R.,* 1944, D.Mass., 56 F.Supp. 969. Once it has been determined that a person does not qualify for citizenship, however, the district court has no discretion to ignore the defect and grant citizenship. *United States v. Ginsberg,* 1917, 243 U.S. 472, 474, 37 S.Ct. 422, 61 L.Ed. 853. The denaturalization statute, 8 U.S.C. § 1451, does not accord the district courts any authority to excuse the fraudulent procurement of citizenship. Indeed, in amending that provision in 1961, Congress stated:

Naturalization is illegally procured if some statutory requirement which is a condition precedent to naturalization is absent at the time the petition was granted. In other words, naturalization has been illegally procured if jurisdictional factors are not present at the time the citizenship is granted.

H.R.Rep. No. 1086, 87th Cong., 1st Sess. 39 (1961), *reprinted in* [1961] 2 U.S.Code Cong. & Admin.News, pp. 2950, 2983. Thus, what the Supreme Court said in *Johannessen v. United States,* 1912, 225 U.S. 227, 241–42, 32 S.Ct. 613, 56 L.Ed. 1066, and repeated in *Knauer v. United States,* 1946, 328 U.S. 654, 673, 66 S.Ct. 1304, 1314, 90 L.Ed. 1500, remains true today:

An alien has no moral nor constitutional right to retain the privileges of citizenship if, by false evidence or the like, an imposition has been practiced upon the court, without which the certificate of citizenship could not and would not have been issued.

REVERSED AND REMANDED. On remand, the district court is directed to enter judgment for the United States and to cancel the certificate of naturalization issued to the defendant.